ROSSER et, Plaintiffs-Appellees, v. ROSSER et,
Defendants-Appellees, and RANK, Defendant-Appellant.

Ohio Appeals, Second District, Darke County.

No. 661.   Decided May 21, 1949.

Wilbur D. Spidel, S. E. Mote, Greenville, for John V. Rosser,
et al, Appellees.

T. A. Billingsley, Marion Murphy, Hugh A. Staley, Greenville,
for Waldo Rank, Appellant.

**OPINION**

By THE COURT:

The appeal is on questions of law and fact from a judgment
setting aside and cancelling a certain deed from Winfield
Scott Rosser to the defendant, Waldo Rank, and ordering
partition of the premises described in the petition among the
heirs at law of said Winfield S. Rosser, deceased.

The issue joined was upon the averment of the petition,

"That the defendant, Waldo Rank, on the 10th day of
August, 1945, by undue persuasion, duress and by exercising
undue influence over said decedent at which time said Win-
field S. Rosser was mentally ill and had not sufficient mental
capacity to be able to understand the nature of the trans-
action, obtained and procured said deed to Waldo Rank, as
Grantee, * * *.   That, at said time, Winfield S. Rosser was
87 years of age and afflicted with arterio sclerosis and senile
dementia, and said Waldo Rank knew of said affliction and

the mental incapacity of Winfield S. Rosser, and obtained said purported deed or conveyance without consideration therefor."

Because of the nature of the appeal, it is our obligation to determine the issues joined as if the case had originated in this Court, to weigh the facts, test the credibility of the witnesses and apply the law as a trial court of first instance.

The record is voluminous, consisting of almost a thousand pages and many exhibits. We have read every line of the testimony, as well as the briefs of the parties. The conflict in the testimony is marked. The statements and conclusions of the witnesses for the parties are utterly irreconcilable. On the one hand, Mr. Rosser was, from 1944 until the time of his death, presented as a doddering old man, utterly incapable of carrying on ordinary business transactions, without mental capacity to appreciate his relation to the natural objects of his bounty and with little or no concept of what was going on currently about him. On the other hand, he was portrayed as a man of exceptional intellect, a brilliant conversationalist, keenly aware of all that was taking place about him and maintaining a lively interest, not only in past events but in those occurring during the years of '44 and '45, and with special interest in matters in which during much of his lifetime he had been intimately concerned.

It is probable that some of the testimony is colored and shaped, in a degree, at least, by the interest of the witnesses in the outcome of the suit. Proper determination of the issues must therefore be made largely from the probabilities from facts that are either not in dispute at all or as to which there is little dispute.

It appears that Winfield S. Rosser, whom we will hereinafter refer to as Rosser, had been engaged in business in Darke County for many years. Some sixteen years before his death he met with an unfortunate accident in which, while standing on the sidewalk, he was struck by an automobile, as a result of which he suffered an injury to his legs. After his injury he never regained the ability to walk without difficulty and for several years prior to his death had remained very closely at his home, leaving only at infrequent intervals. In 1937 he lost his wife and from that time on, it is evident that his mode of living was materially changed. He had no children and was dependent for assistance either upon neighbors or hired help. Because of his infirmity and difficulty in maintaining his household in proper manner, it gradually became dirty and dusty and he, likewise, was neglected, with the result that he was not cleanly. For

several years prior to 1944, he had been cared for indifferently and, it is agreed, was in a deplorable condition as to the cleanliness of his person, his bed and his household. He had been irregular in his habits and had not had the proper food nor was it served to him regularly.

In January, 1944, Mr. S. E. Mote, Rosser's attorney, contacted Rank to hire him to fire Rosser's furnace. When the result of the conference was made known to Rosser he sent for Rank and as a result Rank took over the care and attention of Rosser at his home.

Rank lived several squares from Rosser, his wife was an invalid confined to a wheel chair but notwithstanding her infirmity she prepared the meals for Rosser and her husband carried them to the home of Rosser. Rank also fired the furnace, acted as nurse, bought the groceries and supplies for the house and generally took over the minor management of the household. There is no question but that he did a good job. The meals were served on time. They were palatable and enjoyed by Rosser. He was bathed and cleaned, two women were brought in to clean the house and there was a complete change in his situation. It was entirely satisfactory to Rosser and afforded him that which he had been denied for many years.

It is contended by plaintiffs that Rank was to have $25.00 per week for his services. He denies this and says that there was no understanding as to what he was to receive. The inference from his testimony is that because of the deplorable condition in which he found Rosser he started to attend to him as a matter of sympathy. Mr. Mote says that Rank was engaged for his services at $25.00 per week. As a matter of fact, although Mrs. Macci, who had sued Rosser for more than $5,000.00, had provided him some meals over a period of more than six years prior to Rank's coming, as far as we can tell from the record, she had and claimed no specific contract as to what she should be paid. There is nothing in the record other than the testimony of Mr. Mote from which it may be definitely inferred that Rank was drawing $25.00 per week.

Although Rank testified that he kept an account in '44 and '45, he does not have the account for '44. ' This is unfortunate and has weighed heavily against him with us. However, he does produce what purports to be an account for '45, showing all the money that he had received. If this account is at all accurate, if the total of $25.00 per week had been taken from the amount of money with which he charges himself, there would have been an inadequate sum left to meet the probable demands of maintaining Rosser. There is

set up by plaintiffs a statement of the total amount of money which Rosser had in the years of '44 and '45 until he died. Charging all of this to Rank, it discloses that he would have had $49.22 per week in '44 and $41.56 per week in '45. Manifestly, the record does not trace all of this money into Rank's possession. Had it done so, if it had all been expended on Rosser's needs, it would not have been excessive for the demands of a man in his condition, maintaining a 12-room house, during the period under consideration. Probably, many of the groceries that were used in preparing Rosser's meals also were properly used by Rank's family. Rosser must have understood this would be done because he first proposed that Rank and his family move in with him.

It is urged that Rank prevailed on Rosser to make the deed upon the claim that by so doing he would prevent Mrs. Macci securing the property on her claim. Rank denies this and gives a very reasonable explanation of Rosser's view of the matter to the effect that he had ample to take care of Mrs. Macci without respect to the outcome of her claim. Mrs. Macci, of course, was not a creditor at the time the deed was made. Had she been, and had Rank and Rosser, by collusion intending to defeat Mrs. Macci, knowingly participated in the making and receiving of the deed, Rosser could not be heard in any court to demand a return of the property. The rights of Rosser's heirs would rise no higher than his.

However, the probability on this record is that Rosser desired to reward Rank for the services which he had and would perform because of the value which was placed upon them by Rosser under all the circumstances. He owed nothing to his blood relatives because of the ownership of the property in question which had come to him through his wife. He had the right to conclude that his relatives were not the special objects of his bounty by reason of any service that they had rendered or probably would render to him. By the making of the deed he retained full right during his lifetime to the benefit of his property. He assured until his death continuation of the services which Rank had been rendering him.

It is significant that the deed which Rosser made to Rank, to all intents and purposes, accomplished that which was intended by the deed which Mr. Mote prepared for Rosser, because it was to be held in escrow by Mr. Billingsley until Rosser's death and was only to be delivered to Rank if he continued and completed throughout Rosser's lifetime the services which he was rendering to him when the deed was executed. The making of a deed of Rosser's property to

assure his maintenance did not originate with the coming of Rank. It was the third time that he had entertained the idea.

Upon the ultimate question of Rosser's mental capacity the preparation of the deed by his counsel in May, prior to the time that the deed here under consideration was made in August, is the most significant fact in this case. His attorney was ready to have Rosser execute the deed as prepared by him. Manifestly, it took as much mental capacity to make this deed as it did to complete the latter deed.

It is also notable that those of the plaintiffs who now insist that in 1944 and 1945 Rosser was incapable of transacting ordinary business permitted him to continue to live under the conditions which they knew and with Rank in his employ without any suggestion of his mental infirmity. If in 1944 and 1945 he was in the state of mind to which they testify, it was their plain duty to assure as a matter of protection to him the appointment of a guardian. No such steps were suggested by them or by his attorney and Rank was permitted to minister to Rosser during this whole period and he did so in the only practical manner available to him.

There is no doubt that Rosser was at times subject to some mental aberration. It is agreed that he commented on having an oil well in his basement. Some of the other so-called hallucinations may or may not have occurred. It is apparent that Rosser was given to exaggeration. The statement respecting his winnings on betting on horse races can easily be reconciled upon the theory that he was doing some imaginary betting by picking probable winners from the form sheet in the daily papers. The statements in his deposition that certain members of the Masonic Lodge had come to his home to help him and other statements, if not in accord with the facts, do not necessarily point to mental impairment.

We have read Rosser's deposition in the Macci case and, in all, it reflects the language of an intelligent person. Rosser did not want to admit liability to Mrs. Macci. His theory was well defined, namely, that the services she rendered to him were those of a neighbor; that he had recognized their value and had compensated her by gifts at various times. The amount of money that he paid to her may or may not have been exaggerated, although it probably was. He insisted that she did not take care of him personally; that she did not keep him nor his house clean and it is significant that he states that he was so dirty that he was ashamed of his condition. If Rank interfered with his answers in the deposition,

it is not shown in it, although Rank admits an interruption when inquiry was made as to the amount that she was being paid.

The doctor who attended Rosser saw him only five or six times from November, 1944, until the date of his death. He stated the cause of death to be arterio sclerosis. He does not say that Rosser was incapable of conducting ordinary business transactions except in response to a hypothetical question. This question had hypotheses from which, in their most unfavorable light to Rosser, the doctor drew the conclusion that he was suffering from senile dementia and probably was not capable of doing business. We refer particularly to that part of the question which stressed the lack of personal cleanliness in contrast to the former habit of Rosser to be immaculate and careful in his attire. It is only fair to Rosser to say that his lack of cleanliness was caused by his physical inability to take care of himself. He states in his deposition that on one occasion he had to crawl to his commode. If his dirty condition prior to 1944 argued for mental instability, then the cleanliness of himself and of his surroundings in 1944 and 1945 spoke for an improved mental state. Dr. Wolverton, who paid Rosser a business visit in 1945, expressed the opinion that he was qualified to carry on business transactions.

Arterio Sclerosis is common to elderly persons and no doubt has the effect in varying degrees of slowing up the activities of the mental processes. The fact alone that one is so suffering does not require the conclusion of general mental incapacity.

The signing of the deed was not hastily accomplished. Mr. Billingsley testifies that he took the matter up with Mr. Rosser deliberately, that when the deed was prepared he left it with him for as much as three days. He acted as a witness. The other witness did not sign until later. Upon Mr. Billingsley's testimony, which is that of a person with a minor interest, there can be no doubt that at the time the deed in question was executed Rosser had full capacity to act intelligently and that he was under no compulsion. Other witnesses related to Rosser by marriage who have no interest, unless it be conjectured that they were jealous of the fact that the blood relatives of Rosser and not they, would come into the property if the deed was set aside, also substantiate the conclusion that at the very time that the deed was made Rosser was fully qualified to execute it.

It has long been the practice in will contests for the contestants to introduce the instrument as tending to disclose an

unnatural and illogical distribution of testator's property. Conversely, it is appropriate here to consider this deed in the light of all the circumstances as to the reasonableness and propriety of the transfer of title to the grantee. Under all the conditions appearing, the transfer reflects the reaction of a normal mind, making distribution of property in a logical and appropriate manner. The probability is that Rosser accomplished just what he intended to do when he made the deed. His purpose and the consideration moving to him by the services of Rank, performed and to be performed, are appropriately and effectively set out in the deed from Rosser to Rank prepared by Mr. Mote. Indeed the consummation of the whole matter is well presented in two sentences from this deed, as follows:

"The further consideration for this conveyance is extraordinary services performed by said Waldo Rank for me since January 1st, 1944, and to be performed for me during my natural life by way of nursing, etc. Having been bedfast since said date and having paid said Rank only for his time and board and washing at the rate of about $25.00 a week, **this service for which this conveyance is made is such that no relative would or could desire to render and which is almost impossible to fix in measure of dollars, yet is of the greatest value to me in my condition of helplessness.**" (Emphasis ours.)

There was a confidential relation existing between Rank and Rosser by virtue of the necessities of the situation, but this extended only to the management of the household. When it was necessary to conduct major business transactions Mr. Rosser availed himself of the opportunity of contacting legal counsel. But in the consideration of this case we have not been troubled with the burden of proof and upon whom it devolves. Upon the whole record we are satisfied that the evidence preponderates in favor of the claim that there was a valid consideration for the execution of the deed and that it was not the result of mental incapacity of the grantor nor induced by any undue influence on the part of the grantee.

The judgment will be in favor of the defendant, Waldo Rank, and the prayer of the petition will be denied.

MILLER, PJ, HORNBECK and WISEMAN, JJ. concur.